UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AVERTEST, LLC d/b/a
AVERHEALTH,

      Plaintiff,

                                    Civil Case No. 18-13511
v.                                 Honorable Linda V. Parker

LIVINGSTON COUNTY,

      Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This civil action arises from Defendant Livingston County's April 4, 2018 Request for Proposals for drug testing services, the selection of Plaintiff Avertest LLC, doing business as Averhealth, as the winning bidder, and Livingston County's subsequent decision not to contract with Averhealth. In its Complaint, filed November 12, 2018, Averhealth asserts the following claims against the County: (I) breach of express contract; (II) breach of implied in fact agreement; (III) quantum meruit/breach of implied contract in law; and (IV) promissory estoppel.

The matter is presently before the Court on the County's Motion to Dismiss and/or Motion for Summary Judgment, filed pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56. (ECF No. 25.) The motion has been fully briefed.

(ECF Nos. 29, 30.)  Finding the facts and legal arguments sufficiently presented in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

## I.    Applicable Standard

Although the County labels its motion as one possibly for dismissal pursuant to Rule 12(b)(6), it relies extensively on matters outside the pleadings.  Thus, the Court will evaluate the County's request for relief solely under Rule 56.

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a

2

genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.    Factual Background[1]

Averhealth is a Virginia company that provides drug testing services to courts and other agencies throughout the United States.  (*See* Def.'s Mot. Ex. 2 at 5, ECF No. 25-3 at Pg ID 152.)  On April 4, 2018, Livingston County released a Request for Proposals ("RFP") for drug testing services for its 53rd District Court.

---

[1]Both parties assert facts in their briefs to which they cite no supporting evidence. (*See, e.g.*, Def.'s Br. in Supp. of Mot. at 3, ECF No. 25 at Pg ID 98 ("Plaintiff did not reveal to the interview committee that it would not be providing GM/MS confirmation testing …."); Pl.'s Resp. Br. at 7, ECF No. 29 at Pg ID 417 ("[O]n May 8, 2018, Livingston informed Averhealth that Averhealth had been unanimously selected as the winning bidder.").)  The Court will not rely upon facts related by only one side for which there is no citation to evidence.  To the extent such evidence exists in the record, it is not a district court's duty to search for it. *Wardle v. Lexington-Fayette Urban Cty. Gov't*, 45 F. App'x 505, 509 (6th Cir. 2002) ("[A] district court is not required to search the record to determine whether genuine issues of material fact exist when the non-moving party has failed to point them out."); *Bickley v. Norfolk & W. Ry.*, No. 98-3286, 1999 WL 427026, at *4 (6th Cir. June 15, 1999) ("To survive a motion for summary judgment, it is incumbent upon the nonmovant to point to specific evidence sufficient to show that a reasonable jury could find for the nonmovant.").

(*Id.* Ex. 1, ECF No. 25-2.)  The RFP provides that "[t]he initial contract award will begin on June 2, 2018 and will be until September 30, 2019, with an option for the County, at its discretion, to extend the contract for one (1) additional one-year period."  (*Id.* at 4, Pg ID 127.)

In the RFP, the County reserved the right to *inter alia* "negotiate the terms and conditions of all and any part of the proposals, … and in general to make award in the manner as determined to be in the Board [of Commissioner]'s best interest and its sole discretion."  (*Id.* at 6, Pg ID 129.)  The RFP further provided that the County would not be "liable for any costs incurred by the proposer" and that "[t]he successful contractor shall commence work only after the transmittal of a fully executed contract and after receiving written notification to proceed from Livingston County."  (*Id.* at 9, Pg ID 132.)  The RFP stated that the County had the right to terminate the contract "at any time, with a minimum thirty (30) days written notice to the vendor in the event that the services of vendor are deemed by the County to be unsatisfactory, or upon failure to perform any of the terms and conditions contained in this agreement."  (*Id.*)

The RFP specified the scope of services and listed the required types of tests, which included "GC/MS Confirmation."  (*Id.* at 11-12, Pg ID 134-35.)  It stated that the winning vendor "will perform all services indicated in the RFP and in compliance with the negotiated contract."  (*Id.* at 9, Pg ID 132.)  The County

issued an addendum responding to vendor questions on April 24, 2018, which included a question asking whether the County would accept LC-MS/MS confirmation testing.  (*Id.* at 23, ECF No. 25-2 at Pg ID 146.)  The County answered: "GC/MS is the federal standard and is the preferred confirmation method."  (*Id.*)

On April 30, 2018, Averhealth submitted a proposal in response to the RFP. (Def.'s Reply, Ex. 1, ECF No. 30-1.)[2]  In the proposal, Averhealth states that it "provides all of the 'Required Types of Drug Tests' services specified on page 11 of the RFP" (*id.* at 15, Pg ID 590), and then lists the prices for those services.  (*Id.* at 26, 28-29, Pg ID 601, 603-04.)  The proposal does not specify the type of confirmation testing Averhealth intended to use, listing only "Standard Confirmation Test."  (*Id.* at 28, Pg ID 603.)  Averhealth indicated that it would work with the County to identify the optimal location for its testing center.  (*Id.* at 12, Pg ID 159.)

The County invited Averhealth to interview.  In its presentation, Averhealth identified two "potential locations" for its testing center.  (Def.'s Mot. Ex. 3 at 10-11, ECF No. 25-4 at Pg ID 187-88.)  The first, 2373 West Grand River, was

---

[2] Defendant attached a proposal to its motion, but it was Averhealth's proposal in response to an earlier RFP.  (*See* Def.'s Mot. Ex. 2, ECF no. 25-3.)

5

approximately a half mile from the district court.  (*Id*. at 10, Pg ID 187.)  The second, 138 West Highland Road, was three miles away.  (*Id*. at 11, Pg ID 188.)

On May 11, 2018, the Court Programs Liaison for the Livingston County Trial Courts, Sara Applegate, sent a memo to the County Board of Commissioner's ("Board") recommending Averhealth as the successful bidder on the RFP.  (Pl.'s Resp. Ex. 3 at 3, ECF No. 29-4 at Pg ID 452.)  On May 21, 2018, the Board passed Resolution 2018-05-097 ("Resolution") authorizing an agreement with Averhealth to provide drug and alcohol testing services "at the attached rates" from June 2, 2018 through September 30, 2018, with an option for a one-year renewal.  (Def.'s Mot. Ex. 4, ECF No. 25-5.)  The Resolution authorized the Chairman of the Board "to sign all forms, assurances, contracts/agreements, renewals and future amendments for monetary and contract language adjustments related to the above upon review and/or preparation of Civil Counsel."  (*Id*.)

Before the Resolution was passed, Ms. Applegate sent an email to several county employees indicating that drug testing services would be transitioning from the prior vendor to Averhealth as of June 2, 2018.  (Pl.'s Resp. Ex. 1, ECF No. 29-2 at Pg ID 445.)  According to her email, Ms. Applegate had sent letters to "all specialty court probation officers to distribute to participants telling them when, where and how to begin testing with Averhealth."  (*Id*.)  Averhealth's FAQ sheet was attached to Ms. Applegate's email.  (*Id*. at Pg ID 445-46.)  This sheet listed

2373 West Grand River as the location for the testing center.  (*Id*. at Pg ID 446.)

With respect to Averhealth's testing methodology, the FAQ sheet stated, in part:

"The initial testing is an immunoassay laboratory-based test and confirmation

testing is conducted via LC-MS/MS."  (*Id*.)

On May 22, 2018, Averhealth informed Ms. Applegate that it had not been

able to finalize a lease for the West Grand River property for its testing center.

(Pl.'s Resp. Ex. 5, ECF No. 29-6 at Pg ID 477.)  Averhealth indicated that it was

still working to secure the location but was looking for back-up options and

"making every effort to ensure that this does not delay a June 2 start date." (*Id.*)

The following afternoon, May 23, the County requested a status update on the

lease issue.  (*Id.* Ex 7, ECF No. 29-8.)  Later that evening, Averhealth responded,

indicating that it had not been able to secure the property at 2373 West Grand

River but had found an alternative location at 2810 West Grand River.  (*Id.* Ex. 8,

ECF No. 29-9.)  While "just a bit further from the court," Averhealth remarked that

the new location has "a better building with better parking[.]"  (*Id*.)

On May 24, Averhealth informed the County via email that it had an

agreement for the property at 2810 West Grand River.  (*Id*. Ex. 9, ECF No. 29-10.)

Averhealth requested approval for the location and a contract before executing the

lease, writing:

> Can you please provide both approval and the contract by 10am
> on Friday?  The owner of the property will be in the office for

7

the morning and is then headed to northern Michigan for the holiday weekend.

(*Id*.)  Ms. Applegate responded by email the following morning, writing:

> Per our conversation today, we are approving the new location and have attached the resolution to show that it was approved and a contract will follow in the near future.
>
> Please e-mail me a copy of the lease agreement once it is signed so I may let everyone know about the new testing location.

(*Id.* Ex. 10, ECF No. 29-11.)  Although there appears to have been an attachment to this e-mail, neither party has submitted it to the Court and there is no evidence that the Board of Commissioners adopted any resolution concerning the project other than the May 21, 2018 resolution authorizing an agreement with Averhealth (which does not address the location of the testing center).

Ms. Applegate sent an email to several County employees on May 24, informing them of Averhealth's new location a half mile from the original site. (*Id*. Ex. 11, ECF No. 29-11.)  Ms. Applegate noted that the building at the new location is larger and with more parking.  (*Id*.)  Averhealth claims, although without support, that it subsequently signed a five-year lease for the building.

On June 2, 2018, Averhealth began providing drug testing services for the district court at the 2810 West Grand River location.  (*See* Applegate Dep. at 24, ECF No. 25-7 at Pg ID 212.)  In the meantime, the County and Averhealth engaged in communications concerning certain aspects of Averhealth's services.

(Def.'s Mot. Exs. 5, 12, ECF Nos. 25-6, 25-13.)  For example, in a June 1st email exchange, the County and Averhealth addressed the price to conduct ETG testing separate from a "10 panel UA[.]"  (*Id.* Ex. 5 at 6, ECF No. 25-6 at Pg ID 205.)  The County suggested a cost of $10.00 for the ETG testing, alone.  (*Id.*)  Averhealth responded that the price would need to be $19.95.  (*Id.* at 5-6, Pg ID 204-05.)  Apparently, there were additional conversations concerning the confirmation testing Averhealth used, collection site staffing, courthouse testing, and collections procedures.  (*Id.* at 2, Pg ID 201.)  The latter issue seems to have concerned the protocol for women reporting for testing.  (*Id.* Ex. 9, ECF No. 25-10.)

According to the County's Trial Court Administrator, Roberta Sacharski, other issues arose concerning Averhealth.  (Def.'s Mot. Ex. 12, ECF No. 25-13.)  For example, the RFP required GC/MS confirmation, but Averhealth informed the County it does not offer this testing and that it provides a "screening" rather than "confirmation."  (*Id.* ¶ 4, Pg ID 228.)  Ms. Sacharski also indicates that Averhealth's testing practices "were actually contrary to, and not consistent with the procedures that the County was advised would be used."  (*Id.* ¶ 6, Pg ID 229.)  She further states that the testing center "promised in [Averhealth's] interview presentation … was a major factor in awarding the bid to [it]" but that location fell

9

through and was substituted for a location further from the courthouse and "in a less desirable location." (*Id.* ¶ 5, Pg ID 228.)

On or about June 4, 2018, Ms. Sacharski asked several County employees about the status of the contract with Averhealth, indicating that she wanted to see it before Averhealth as she thought there would be points requiring clarification prior to the County executing the contract. (Pl.'s Resp. Ex. 13, ECF No. 29-14.) On June 5, Ms. Applegate emailed Averhealth:

> It has become apparent that there are a number issues that have yet to be resolved. Unless and until we can work through a number of points and reduce them to a contract, we are not comfortable sending our participants for testing with your agency at this time. We will be meeting with the selection team and legal counsel to discuss these issues further and will be in touch, as soon as possible, to decide the best course of action going forward for all parties.

(*Id.* Ex. 14, ECF No. 29-15.) On the same date, Ms. Applegate informed County employees that testing with Averhealth was being suspended and that testing would be conducted by another vendor beginning June 6. (*Id.* Ex. 15, ECF No. 29-16.)

Ms. Sacharski sent an email to Averhealth on June 7, terminating its services. (*Id.* Ex. 16, ECF No. 29-17.) In this correspondence, Ms. Sacharski cites "inaccuracies, concerns and inabilities to meet [the County's] needs" as the reason the County "will *not* be contracting with Averhealth." (*Id.* (emphasis in original).) She identified specifically only Averhealth's unwillingness to provide GC/MS

Confirmation.  (*Id*.)  Ms. Sacharski requested a billing for all services performed by Averhealth through June 7, 2018, indicating that any testing thereafter would not be authorized or paid for by the County.  (*Id*.)

On June 8, Averhealth sent the County an invoice for $112,547.99.  (Def.'s Mot. Ex. 11, ECF No. 25-12.)  This amount included $1,663.50 for testing services between June 2 and 7, as well as costs for employee payroll and severance, "Experienced Opening Team" expenses and payroll, customer implementation and training, the expense of collections supplies, transportation costs, site build out expenses, and the acquisition of the testing center.  (*Id*.)  The County paid for the testing services and nothing more.  (*Id.* Ex. 8, ECF No. 25-9.)

## III.    Applicable Law and Analysis

### A.    Breach of Express Contract (Count I)

The County argues that there was never an express contract between it and Averhealth and that this claim, therefore, fails.  The County explains that the RFP only approved a future contract, but that actual formation of a contract required negotiating the essential terms, reducing those terms to a writing, obtaining approval from the County attorney as to the agreement's form, and the signature of the Board's Chairman.  None of this, the County says, occurred.  Moreover, the RFP expressly required a written agreement.  The County argues that Averhealth's

position is that of a disappointed bidder who, Michigan case law holds, lacks

standing to challenge the results of the bidding process.

Pursuant to the long-established "disappointed bidder" rule, an entity or

individual that is unsuccessful in bidding on a public contract lacks standing to

challenge the result or the bidding process itself. *Talbot Paving Co. v. Detroit*, 67

N.W. 979, 980-81 (Mich. 1896); *see also Cedroni Assoc. v. Tomblinson, Harburn*

*Assoc., Architects & Planners, Inc.*, 821 N.W.2d 1, 3 (Mich. 2012) (citing *Detroit*

*v. Wayne Circuit Judges*, 87 N.W. 376 (Mich. 1901)). In most cases, the rule is

applied to one whose bid is not chosen. *See, e.g., id.* Yet, the County cites two

unpublished Michigan Court of Appeals' decisions where the rule was found

applicable to plaintiffs who were the successful bidders, but contracts were never

formed with the public entity. *Farrow Grp., Inc. v. Detroit Land Bank Auth.*, No.

341822, 2019 WL 2194972, at *1 (Mich. Ct. App. May 21, 2019) (unpublished);

*WDG Inv. Co. v. Mich. Dep't of Mgmt. & Budget*, No. 229950, 2002 WL

31424731, at *4 (Mich. Ct. App. Oct. 25, 2002) (unpublished). Although

unpublished, the latter case is particularly instructive here.

In *WDG Investment*, the Michigan Department of Management and Budget

("DMB") issued a Report for Proposals to collect bids from developers for a new

state office building. 2002 WL 31424731, at *1. The RFP expressly stated: "A

winning proposal will be selected with the explicit understanding that the

12

implementation of that proposal will be governed by a lease contract ….”  *Id.*  The

RFP incorporated several documents, including a “standard state commercial

lease,” which provided that it would not be binding or effective without approval

of the lessor, the lessee, the Attorney General, DMB, the building committee of the

state administrative board, and the state administrative board.  *Id.*  The plaintiff

was selected as the successful bidder, but in response to a letter of protest, the

DMB decided to reject all bids.  *Id.* at *1-2.

The Michigan Court of Appeals concluded that “the mere selection of [the]

plaintiff’s proposal at the initial state of the process created no legally protected

interest in a binding agreement.”  *Id.* at 4.  The court reasoned:

> [D]efendants’ initial approval of plaintiff’s proposal only
> created the environment to begin negotiations and did not
> obligate defendants beyond the negotiation stage.  While
> plaintiff was deemed to have submitted the winning proposal in
> this matter, that award was rescinded before any binding
> agreement was entered into.  Further steps were required before
> a final agreement could be reached. . . . As set forth in the RFP
> itself, any agreement with defendants was not binding until all
> necessary parties had approved a final lease contract.
> Accordingly, plaintiff’s status remained simply as a bid, even a
> “successful bidder”, but it never entered into a binding
> agreement before defendants informed plaintiff that all bids
> were being rejected.

*Id.*  As to the plaintiff’s complaint that it expended money developing the project

based on the selection of its bid, the court concluded that “it expended those sums

without any legal basis for holding defendants liable and at its own risk.”  *Id.*

The Sixth Circuit's decision in *United of Omaha Life Insurance Company v. Solomon*, 960 F.2d 31 (6th. Cir. 1992), further supports the conclusion reached in *WDG Investment*.  Interpreting Michigan law, the Sixth Circuit concluded that a bidder does not have a property interest in a public contract where the public entity "retained discretionary authority to reject any and all bids and to 'accept' a bid only by signing a contract or a purchase order." *Id.* at 34-35.  Until the contract or purchase order is signed, the Sixth Circuit explained, the successful bidder has not been "awarded" the public contract.  *Id.* at 35.

Here, the Board of Commissioner's Resolution did not award a contract to Averhealth but only authorized its Chairman to contract with this vendor.  The RFP stated that the work of the successful bidder could commence "only after the transmittal of a fully executed contract[3] and after receiving written notification to proceed from Livingston County."  (Def.'s Mot. Ex. 1 at 9, ECF No. 25-2 at Pg ID 132.)  Even if the Court concluded that there was a meeting of the minds with

---

[3]Averhealth attempts to distinguish this case from *WDG Investment* because the RFP in that case required the approval of several entities.  (Pl.'s Resp. Br. at 22, ECF No. 29 at Pg ID 432.)  Livingston County's RFP, however, likewise required additional approval (from the County's attorney and the Chairman of the Board).  Averhealth also points to the fact that the plaintiff in *WDG Investment* was explicitly told that the process would take one to two months and that if it proceeded to work it did so at its own risk.  (*Id.*)  Yet the Michigan Court of Appeals did not rely on those facts in concluding that the plaintiff's claims failed.  *WDG Inv.*, 2002 WL 31424731, at *4.  In any event, the RFP explicitly advised bidders of what was required before the project could begin.

respect to other material terms of a contract, these requirements to bind the parties had not been met.  The RFP states that "[t]he contents of th[e] RFP and the vendor's response will become contractual obligations *if* a contract ensues."  (*Id.* (emphasis added).)  A contract was never fully executed and thus Averhealth proceeded at "its own risk."  *WDG Inv.*, 2002 WL 31424731, at *4.  Even if Averhealth "was awarded the bid," as it contends (Pl.'s Resp. Br. at 20, ECF No. 29 at Pg ID 430), it was not awarded a contract.  And Averhealth cites no case to suggest otherwise.

Nor did Averhealth receive written notification to proceed from Livingston County.  Averhealth points to an email communication from Ms. Applegate to show that the County "expressly instructed Averhealth to perform under the parties' oral agreement with the promise that a contract would come 'in the near future.'"  (Pl.'s Resp. Br. at 22, ECF No. 29 at Pg ID 432.)  However, the Resolution expressly granted authority to only the Board's Chairman with respect to the agreement with Averhealth.

It is well-established under Michigan law "'that those dealing with public officials must take notice of their powers.'"  *Wolverine Eng'rs & Surveyors, Inc. v. City of Leslie*, No. 299988, 2011 WL 5609822, at *2 (Mich. Ct. App. Nov. 17, 2011) (quoting *Superior Ambulances Serv. v. City of Lincoln Park*, 173 N.W.2d 236, 238 (Mich. Ct. App. 1969)).  The Michigan courts also adhere to the

longstanding principle that "[p]ersons dealing with a municipal corporation through one of its officers must at their peril take notice of the authority of the particular officer to bind the corporation.  If the officer's act is beyond the limits of his or her authority, the municipality is not bound.'"  *Id.* (quoting *Superior Ambulances*, 173 N.W.2d at 238).  The evidence reflects Averhealth's recognition of Ms. Applegate's limited authority to bind the County as it specifically requested the contract from the County before executing the lease for the testing center. (Pl.'s Resp. Ex. 9, ECF No. 29-10.)  In fact, Averhealth asserts in response to the County's motion that it was not relying on Ms. Applegate's authority, as it explicitly asked for approval from the Board and the written contract.  (Pl.'s Resp. Br. at 24, ECF No. 29 at Pg ID 434.)  But Averhealth never received either, and clearly Averhealth is relying on Ms. Applegate's representations to support its claim as it cites the assertions in her May 25 email as the go ahead for it to proceed.  (*Id.*)

For these reasons, the Court concludes that the County is entitled to summary judgment on Averhealth's breach of express contract claim.

### B.    Implied Contract Claims (Counts II-IV)

"Under Michigan law, an implied-in-fact contract arises between parties when those parties show a mutual intention to contract."  *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 504 (6th Cir. 1995) (citing *Erickson v. Goodell*

*Oil Co.*, 180 N.W.2d 798, 800 (1970)).  "[T]he terms of an implied-in-fact contract are 'determined by the parties' conduct or other pertinent circumstances surrounding the transaction.'"  *Anton v. SBC Global Servs., Inc.*, 350 F. App'x 39, 43 (6th Cir. 2009) (quoting *Kingsley Assocs.*, 65 F.3d at 504) (additional citations and brackets omitted).  "'In deciding whether there was mutual assent to an implied contract term, Michigan courts use an objective test, looking to the expressed words of the parties and their visible acts.'"  *Id.* (quoting *Rowe v. Montgomery Ward & Co., Inc.*, 473 N.W.2d 268, 273 (1991)) (internal quotation marks omitted).

"[T]o sustain a claim of quantum meruit or unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant."  *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App. 2006) (citing *Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 796 (Mich. Ct. App. 1993)).  "In other words, the law will imply a contract to prevent unjust enrichment only if the defendant has been unjustly or inequitably enriched at the plaintiff's expense."  *Id*.

Finally, promissory estoppel arises in equity when the following conditions exist:

> (1) there is a promise (2) that the promisor should have reasonably have expected to induce action of a definite and

17

> substantial character on the part of the promisee (3) which in
> fact produces reliance or forbearance of that nature (4) under
> circumstances such that the promise must be enforced if
> injustice is to be avoided.

*Barber*, 509 N.W.2d at 797 (citations omitted).  The promise must be definite and

clear.  *Id*.  "[T]he reliance interest protected … is *reasonable reliance* …."  *State*

*Bank of Standish v. Curry*, 500 N.W.2d 104, 107 (Mich. 1993).  Therefore, when

deciding whether a requisite promise existed, courts must "objectively examine the

words and actions surrounding the transaction in question as well as the nature of

the relationship between the parties and the circumstances surrounding their

actions."  *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct.

App. 1999) (citations omitted).  "The doctrine of promissory estoppel is cautiously

applied."  *Marrero v. McDonnell Douglas Capital Corp.*, 505 N.W.2d 275, 279

(Mich. Ct. App. 1993); *see also Gason v. Dow Corning Corp*, 674 F. App'x 551,

559 (6th Cir. 2017) (quoting *Morrero*).

The Michigan courts deny claims against a municipality under quantum

meruit and implied contract theories where the municipality lacked the power to

enter a contract for the services or goods at hand.  *See Wolverine Eng'rs*, 2011 WL

5609822, at *3 (citing cases).  Nevertheless, the State's courts also have held that

"[a]n implied contract may be found when the municipal corporation possessed the

authority to enter the contract and retained its benefit, but a defect or irregularity

prevented the formation of a valid contract.  *Id*. (citing *Webb v. Wakefield Twp.*,

18

215 N.W. 43, 45 (Mich. 1927); *See also Parker v. West Bloomfield Twp.*, 231 N.W.2d 424, 428-29 (Mich. Ct. App. 1975) ("[I]t seems that Michigan falls within the general rule that while the doctrine of estoppel is inapplicable to [u]ltra vires acts, it will be applied to bind the municipality if the act is within the municipality's general powers, but is performed in an irregular fashion or in an unauthorized manner."). In that instance, "a [municipal corporation] cannot shield itself behind a defense based on the manner in which the contract was made, and retain the benefits of the contract, without tendering at least a reasonable compensation for the benefits received." *Webb*, 215 N.W. at 45.

The party seeking to bind the municipality "must show a good faith reliance upon the municipality's conduct, lack of actual knowledge or lack of the means of obtaining actual knowledge of the facts in question, and … must show a change in position to the extent that [the] plaintiff would incur a substantial loss were the local government allowed to disaffirm its previous position." *Parker*, 231 N.W.2d at 428 (internal quotation marks and citation omitted). The authority of the official on whose conduct a party relies is relevant when deciding whether the party relied in good faith on the official's conduct. *Id.* at 431. Again, one must take notice of the city official's authority and is bound to know whether the official has acted legally within his or her bounds. *Id.* (citation omitted).

As discussed above, Averhealth knew that the RFP required a written contract, approved by the County's Attorney, and signed by the Board's Chairman. Averhealth concedes that Ms. Applegate lacked the authority to bind the County, arguing that it therefore never sought or relied on her assertions but requested the approval of the Board.  (Pl.'s Resp. Br. at 25, ECF No. 29 at Pg ID 435.) Moreover, nothing about Ms. Applegate's conduct indicated that a written contract had been finalized or approved by the necessary parties or that the conditions for the project to proceed had been waived.  Instead, Ms. Applegate stated only that the new location had been approved and that "a contract will follow in the near future."  As such, Averhealth cannot establish that the parties had a meeting of the minds or that it relied in good faith on Ms. Applegate's conduct when proceeding.

In addition, the undisputed evidence reflects ongoing discussions between the parties concerning the terms of the not-yet finalized contract.  For example, the County had requested a price to conduct ETG testing, only, and the parties did not come to an agreement as to the price.  (Def.'s Mot. Ex. 5, ECF No. 25-6.)  While the Resolution did authorize an agreement with Averhealth "at the attached rates" (*Id.* Ex. 4, ECF No. 25-5)—notably, the attached rates are not part of the record— Averhealth presents no evidence demonstrating a previous agreement as to the price of ETG testing on its own.  Further, after the Resolution, the County discovered that Averhealth would not be providing the required GC/MS

20

confirmation testing.  Contrary to Averhealth's arguments, the County's answer to the question regarding confirmation testing did not express a willingness to accept LC-MS/MS confirmation testing.  (*See* Def.'s Mot. Ex. 1 at 23, ECF No. 25-2 at Pg ID 146.)  Averhealth's proposal did not reflect that it would be providing something other than the required confirmation testing.  (*See* Def.'s Reply Ex. 1 at 28, ECF No. 30-1 at Pg ID 603.)  The record reflects that no agreement had been reached as to these material terms.

But even if the Court found the parties bound to an implied agreement or that an enforceable promise had been made, the only agreement or promise expressed was for the County to pay Averhealth for the testing services provided for a four-month period.  Averhealth was not guaranteed a minimum number of tests.  The agreement required the County to pay only the agreed price for testing completed.  It did not require the County—and there is no evidence reflecting a promise by the County—to pay or reimburse Averhealth for any of the other costs included in Averhealth's June 8, 2018 invoice.  The RFP expressly stated that the County would not be liable for any costs incurred by the proposer.

The County paid Averhealth the full amount owed for the tests performed from June 2 to 7.  As any recovery would be limited to the costs of test performed and there is no dispute that this amount has been paid, Averhealth's implied contract, quantum meruit, and promissory estoppel claims fail on this basis, as

21

well.  *See Kamalnath v. Mercy Memorial Hosp. Corp.*, 487 N.W.2d 499, 551 (Mich. Ct. App. 1992) ("The doctrine of quantum meruit allows a party to recover the reasonable value of services rendered."); *Webb v. Wakefield Twp.*, 215 N.W. 43, 45 (Mich. 1927) ("In an action on a contract which is not ultra vires, a municipal corporation may not shield itself behind a defense based on the manner in which the contract was made, and retain the benefits of the contract, without tendering at least a reasonable compensation for the benefits received."); *see also* 20 Mich. Civ. Jur. Public Contracts § 52 (2013) ( "Where contracts entered into by municipal officers are made irregularly, but are not ultra vires, and the township retains and enjoys the benefits without protest, it is obligated to pay a reasonable compensation.").

For these reasons, the Court also concludes that the County is entitled to summary judgment with respect to Averhealth's implied contract claims.

## IV.   Conclusion

The County selected Averhealth as the winning bidder to provide drug testing services; however, the Resolution provided that the project could not proceed until a written contract was approved by counsel for the County and approved and signed by the Chairman of the County Board of Commissioners. Moreover, the Resolution only authorized a contract for four months, with an option to renew.  Despite knowing these conditions, Averhealth signed a purported

five-year lease for a testing center and prepared to provide the required testing. Without the necessary contract or an indication from a County official with proper authority that the requirements of the Resolution had been waived, Averhealth proceeded at its own risk.  In any event, the County has now paid Averhealth for the value of any services received.

For these reasons, the Court concludes that the County is entitled to summary judgment with respect to all of the claims in Averhealth's Complaint.

Accordingly,

**IT IS ORDERED** that Livingston County's motion for summary judgment (ECF No. 25) is **GRANTED**.

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE


Dated: August 3, 2020